**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

Dennis Gordan, John Hine, Donna Flieger,
Patricia Hurley, Ronald Lindner, Janice
Reynolds, and Sharon Jewell, individually and
as Representatives of a class of similarly
situated persons, and on behalf of the
MassMutual Thrift Plan,

        Plaintiffs,

v.

Massachusetts Mutual Life Insurance Co.,
Roger Crandall, Stuart H. Reese, Robert
O'Connell, Investment Fiduciary Committee,
Plan Administrative Committee, Isadore
Jermyn, Michael Fanning, Mary Wilson
Kibbe, Debra Palermino, Michael Rollings,
Elaine Sarsynski. Richard Goldstein,
Christine Fini, and John Does 1-20,

        Defendants.

Civil Action No. 3:13-cv-30184-MAP

**ORAL ARGUMENT REQUESTED**

**LEAVE TO FILE EXCESS PAGES
GRANTED ON JUNE 11, 2015**

**MEMORANDUM IN SUPPORT OF DEFENDANTS' RENEWED MOTION TO
DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT**

James O. Fleckner (BBO# 641494)
Alison V. Douglass (BBO# 646861)
Goodwin Procter LLP
53 State Street
Boston, Massachusetts 02109
Tel.:  617.570.1000

Attorneys for Defendants

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................2

I.     The MassMutual Thrift Plan ........................................................................2

II.    Plaintiffs' Allegations .................................................................................6

III.   Procedural History .....................................................................................7

ARGUMENT .........................................................................................................8

I.     Plaintiffs Have Not Plausibly Pleaded Any ERISA Violation. ....................8

     A.     Counts I and II Fail Because Plaintiffs Plead No Breach of Fiduciary Duty. ...9

           1.    Plaintiffs Plead No Direct Fact of Any Deficiency In Defendants' Process, as Required by *Tibble*. ...9

           2.    Plaintiffs Plead No Circumstantial Facts to Support Any Plausible Inference of a Fiduciary Breach ...11

           3.    Plaintiffs Fail to Plead that Inclusion of the GIA Violates ERISA ...16

     B.     Counts III and IV Fail Because Plaintiffs Fail to State Prohibited Transaction Claims. ...20

     C.     Count V Fails Because Plaintiffs Fail to Allege a Violation of the Plan Document. ...21

II.    Plaintiffs' Claims Are Time-Barred ...23

     A.     Plaintiffs' Claims Are Entirely Barred by ERISA's Three-Year Statute of Limitations. ...23

     B.     Even After *Tibble*, ERISA's Six-Year Statute of Limitations Largely Bars Plaintiffs' Claims. ...24

           1.    *Tibble* Does Not Impact Counts III, IV, and V, Which Are Time-Barred ...24

           2.    Even After *Tibble*, Plaintiffs' Breach of Fiduciary Claims in Counts I and II Are Largely Time-Barred. ...26

     C.     Plaintiffs Fail to Adequately Plead Fraud or Concealment to Revive Stale Claims. ...27

III.   Plaintiffs Fail to State Claims Against a Number of the Specific Defendants. ...28

     A.     Plaintiffs Fail to State Any Claim as to Roger Crandall, Stuart H. Reese and/or Robert O'Connell. ...29

           1.    Plaintiffs State No Fiduciary Breach by the CEOs. ...29

           2.    Mr. O'Connell Is Not Subject to Any Claims Because He Left MassMutual More than Six Years Before the Complaint Was Filed. ...30

B.       Plaintiffs Fail to State Any Claim as to Elaine Sarsynski.....................................31

C.       Plaintiffs Fail to State Any Claim as to MassMutual. ...........................................32

CONCLUSION........................................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alves v. Harvard Pilgrim Healthcare Inc.*,
   204 F. Supp. 2d 198 (D. Mass. 2002) ...................................................................13

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
   464 F.3d 338 (2d Cir. 2006)...............................................................................12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................8, 10, 11, 13, 28

*Beddall v. State Street Bank and Trust Co.*,
   137 F.3d 12 (1st Cir. 1998).................................................................2, 28, 29

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................8, 10, 11

*Bunch v. W.R. Grace & Co.*,
   555 F.3d 1 (1st Cir. 2009)..........................................................................9

*Cataldo v. U.S. Steel Corp.*,
   676 F.3d 542 (6th Cir. 2012) ....................................................................27

*In re Citigroup ERISA Litig.*,
   __ F. Supp. 3d __, No. 11 CV 7672 JGK, 2015 WL 2226291
   (S.D.NY. May 13, 2015)..........................................................................24

*In re Citigroup ERISA Litig.*,
   662 F.3d 128 (2d Cir. 2011)......................................................................23

*David v. Alphin*,
   704 F.3d 327 (4th Cir. 2013) ...............................................................25, 26

*DiFelice v. U.S. Airways, Inc.*,
   397 F. Supp. 2d 758 (E.D. Va. 2005) ....................................................32

*Donovan v. Cunningham*,
   716 F.2d 1455 (5th Cir. 1983) ...........................................................9, 25

*Dupree v. The Prudential Ins. Co. of Am.*,
   No. 99-8837-Civ.-JORDAN, 2007 WL 2263892 (S.D. Fla. Aug. 7, 2007) ...........................14

*In re Dynegy, Inc. ERISA Litig.*,
   309 F. Supp. 2d 861 (S.D. Tex. 2004) ...............................................29, 30

*Edes v. Verizon Commc'ns, Inc.*,
   417 F.3d 133 (1st Cir. 2005)..............................................................23, 26

*Epstein v. C.R. Bard, Inc.*,
   460 F.3d 183 (1st Cir. 2006)........................................................................27

*Felder v. WMATA*,
   No. CV 14-01905 (TFH), 2015 WL 2447342 (D.D.C. May 21, 2015)..................11

*Fifth Third Bancorp v. Dudenhoeffer*,
   134 S. Ct. 2459 (2014)..........................................................................13, 23

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009) ..........................................................11, 12, 13, 31

*Heimeshoff v. Hartford Life & Accident Ins. Co.*,
   134 S. Ct. 604 (2013)..................................................................................13

*Hughes Aircraft Co. v. Jacobson*,
   525 U.S. 432 (1999)..................................................................................32

*Hull v. Policy Mgmt. Sys. Corp.*,
   No. CIV. A.3:00-778-17, 2001 WL 1836286 (D.S.C. Feb. 9, 2001) ................29, 32

*Hunter v. Custom Bus. Graphics*,
   635 F. Supp. 2d 420 (E.D. Va. 2009) ..........................................................27

*J. Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*,
   76 F.3d 1245 (1st Cir. 1996)........................................................................27

*John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*,
   510 U.S. 86 (1993)................................................................................18, 19

*Johns v. Hebert*,
   2 App. D.C. 485 (1894) ................................................................................9

*Kalish v. Franklin Advisers, Inc.*,
   742 F. Supp. 1222 (S.D.N.Y. 1990)................................................................12

*Larson v. Northrop Corp.*,
   21 F.3d 1164 (D.C. Cir. 1994)......................................................................27

*Leber v. Citigroup, Inc.*,
   No. 07 Civ. 9329 (SHS), 2010 WL 935442 (S.D.N.Y. Mar. 16, 2010) ............16, 21

*In re Lernout & Hauspie Sec. Litig.*,
   286 B.R. 33 (D. Mass. 2002) ........................................................................2

*Lockheed Corp. v. Spink*,
  517 U.S. 882 (1996) ......................................................................................32

*Loomis v. Exelon Corp.*,
  658 F.3d 667 (7th Cir. 2011) ...............................................................5, 12, 13

*Mack Boring & Parts v. Meeker Sharkey Moffitt*,
  930 F.2d 267 (3d Cir. 1991) ..........................................................................19

*In re McKesson HBOC, Inc. ERISA Litig.*,
  No. C00-20030RMW, 2002 WL 31431588 (N.D. Cal. Sept. 30, 2002) ................29

*Mehling v. N.Y. Life Ins. Co.*,
  163 F. Supp. 2d 502 (E.D. Pa. 2001) ..............................................................21

*Merrimon v. Unum Life Ins.*,
  758 F.3d 46 (1st Cir. 2014) ............................................................................18

*Mertens v. Hewitt Assocs.*,
  508 U.S. 248 (1993) ......................................................................................28

*New Albany Tractor, Inc. v. Louisville Tractor, Inc.*,
  650 F.3d 1046 (6th Cir. 2011) ..................................................................10, 11

*Pegram v. Herdrich*,
  530 U.S. 211 (2000) ................................................................................28, 29

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*,
  712 F.3d 705 (2d Cir. 2013) ......................................................................10, 15

*Peoria Union Stock Yards Co. Ret. Plan v. Penn. Mut. Life Ins. Co.*,
  698 F.2d 320 (7th Cir. 1983) ..........................................................................19

*In re Polaroid ERISA Litig.*,
  362 F. Supp. 2d 461 (S.D.N.Y. 2005) ..............................................................29

*In re Prudential Ins. Co. of Am. SGLI/VGLI Contract Litig.*,
  No. 3:11-md-02208-MAP, slip op. (D. Mass. Nov. 22, 2013) .......................18, 19

*Rederford v. U.S. Airways, Inc.*,
  589 F.3d 30 (1st Cir. 2009) ..............................................................................8

*Renfro v. Unisys Corp.*,
  671 F.3d 314 (3d Cir. 2011) ..................................................................12, 13, 31

*Reso Artisan Int'l Fund v. Artisan Partners Ltd. P'ship*,
  No. 11-CV-873-JPS, 2011 WL 5826034 (E.D. Wis. Nov. 18, 2011) ....................12

*Santomenno v. John Hancock Life Ins. Co.*,
    768 F.3d 284 (3d Cir. 2014)......................................................................31

*Schatz v. Republican State Leadership Comm.*,
    669 F.3d 50 (1st Cir. 2012)........................................................................8

*Schulist v. Blue Cross of Iowa*,
    717 F.2d 1127 (7th Cir. 1983) ..................................................................31

*Sepúlveda-Villarini v. Dept. of Educ. of P.R.*,
    628 F.3d 25 (1st Cir. 2010)........................................................................8

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996).......................................................................2

*Skin Pathology Assocs., Inc. v. Morgan Stanley & Co.*,
    27 F. Supp. 3d 371 (S.D.N.Y. 2014).........................................................21

*Stargel v. SunTrust Banks, Inc.*,
    968 F. Supp. 2d 1215 (N.D. Ga. 2013) ...............................................25, 26

*In re Stillwater Capital Partners Inc. Litig.*,
    858 F. Supp. 2d 277 (S.D.N.Y. 2012)........................................................2

*Teets v. Great-West Life & Annuity Ins. Co.*,
    Civil Action No. 14-2330, 2015 WL 2455464 (D. Col. May 22, 2015)...................................19

*Tibble v. Edison Int'l*,
    729 F.3d 1110 (9th Cir. 2013) ...............................................................7, 22

*Tibble v. Edison Int'l*,
    135 S. Ct. 1823 (2015) ..................................................................... *passim*

*Turner v. Davis Select Advisers LP*,
    4:08-cv-00421-AWT, slip op. (D. Ariz. June 1, 2011)...........................12

*Watson v. Consol. Edison of N.Y.*,
    594 F. Supp. 2d 399 (S.D.N.Y. 2009).......................................................27

*Watson v. Deaconess Waltham Hosp.*,
    298 F.3d 102 (1st Cir. 2002)......................................................................30

*Watterson v. Page*,
    987 F.2d 1 (1st Cir. 1993)...........................................................................2

*Wright v. Oregon Metallurgical Corp.*,
    360 F.3d 1090 (9th Cir. 2004) ..................................................................25

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
   550 F. Supp. 2d 416 (S.D.N.Y. 2008)..................................................................23

## STATUTES AND RULES

29 U.S.C. § 1002(18)(B) (ERISA § 3(18)(B))............................................................20

29 U.S.C. § 1022(a) (ERISA § 102(a))......................................................................24

29 U.S.C. § 1101(b)(2) (ERISA § 401(b)(2))............................................................18

29 U.S.C. § 1101(b)(2)(B) (ERISA § 401(b)(2)(B)) ................................................18

29 U.S.C. § 1104(a)(1)(A) (ERISA § 404(a)(1)(A)) ...................................7, 25, 26, 27

29 U.S.C. § 1104(a)(1)(B) (ERISA § 404(a)(1)(B))....................................7, 25, 26, 27

29 U.S.C. § 1104(a)(1)(D) (ERISA § 404(a)(1)(D)) ..........................................7, 21, 26

29 U.S.C. § 1106(a) (ERISA § 406(a))...............................................................7, 20, 25

29 U.S.C. § 1106(b) (ERISA § 406(b)) ..............................................................7, 20, 25

29 U.S.C. § 1108(b)(2) (ERISA § 408(b)(2)) ............................................................21

29 U.S.C. § 1108(b)(5) (ERISA § 408(b)(5)) ............................................................20

29 U.S.C. § 1108(b)(8) (ERISA § 408(b)(8)) ............................................................20

29 U.S.C. § 1109(b) (ERISA § 409(b)) .....................................................................30

29 U.S.C. § 1113(2) (ERISA § 413(2)) ..............................................................23, 27

29 U.S.C. § 1132(a)(3) (ERISA § 502(a)(3)) ............................................................28

Fed. R. Civ. P. 8..................................................................................................10, 28

Fed. R. Civ. P. 9(b) .....................................................................................................27

Fed. R. Civ. P. 12(b)(6)....................................................................................2, 8, 10, 11

## OTHER AUTHORITIES

29 C.F.R. § 2550.404c-1(b)(3)(ii).............................................................................17

29 C.F.R. § 2550.404c-1(e)(1)(iii)............................................................................17

A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees § 684 (3d ed. 2009) ......................3

A.M. Best, Best's Financial Strength Ratings Guide (2015),
  http://www3.ambest.com/ratings/default.asp........................................................2, 3

Class Exemption Involving Mutual Fund In-House Plans Requested by the
  Investment Company Institute, 42 Fed. Reg. 18,734 (Apr. 8, 1977) (PTE 77-3)........14, 20, 21

Class Exemption To Permit Sales of Employee Benefit Funding Contracts By
  Insurance Companies That Are Substantially Affiliated with Employers
  Maintaining the Plans, 44 Fed. Reg. 46,365 (Aug. 7, 1979) (PTE 79-41) .......................14, 20

DOL Opinion Letter 77-46 to Mr. Federic S. Kramer, Nat'l Ass'n of Mut. Sav.
  Bank (June 7, 1977),
  http://www.fdic.gov/regulations/examinations/trustmanual/appendix_e/e_ao.h
  tml .................................................................................................................................17

Fiduciary Requirements for Disclosure in Participant-Directed Individual Account
  Plans; Final Rule, 75 Fed. Reg. 64910 (Oct. 20, 2010) ..........................................17

H.R. Rep. No. 93-1280 (1974), reprinted in 1974 U.S.C.C.A.N. 5038 ...........................14, 17, 19

MassMutual 2014 Annual and Corporate Responsibility Report,
  https://www.massmutual.com/~/media/files/annualreport.pdf ...................................2

Participant Directed Individual Account Plans, 56 Fed. Reg. 10,724 (Mar. 13,
  1991) .............................................................................................................................14

Press Release, MassMutual Retirement Services Earns Record Satisfaction
  Ratings from Plan Sponsors (May 20, 2015),
  https://www.massmutual.com/about-us/news-and-press-releases/press-
  releases/2015/05/20/10/20/massmutual-retirement-services-earns-record-
  satisfaction-ratings-from-plan-sponsors ...................................................................3

Press Release, MassMutual Retirement Services Named "Retirement Leader of
  the Year" at 19th Annual Mutual Fund Industry Awards (Apr. 11, 2012),
  http://www.prnewswire.com/news-releases/massmutual-retirement-services-
  named-retirement-leader-of-the-year-at-19th-annual-mutual-fund-industry-
  awards-146967885.html..............................................................................................3

Restatement (Third) of Trusts, § 77 cmt. a (2007) .......................................................9

## **INTRODUCTION**

Plaintiffs bring a wide-ranging putative class action that challenges the process employed by MassMutual and its senior-most executives in managing the retirement plan made available for all participants, including both Plaintiffs and the Individual Defendants themselves.  There are a number of flaws requiring dismissal of the Complaint, but one is particularly glaring.  Plaintiffs do not plead a single fact allegation about the allegedly deficient process they challenge.  Plaintiffs' response is simple:  "MassMutual has lots of" money; "[t]hey have lots of insurance that will pay all these [discovery] costs" needed to allow Plaintiffs to test their speculative claims through discovery.  Doc. 64, at 34:3-4.  The Supreme Court prohibits exactly this type of strike suit and requires much more to unlock the doors to the courthouse.  The absence of any fact allegation whatsoever about the challenged process is all the more glaring given that the Supreme Court's decision in *Tibble v. Edison*—the pendency of which caused the Court to stay this case—recognizes ERISA's requirement of a "regular review" of investments.  Absent any allegation about that review, Plaintiffs' attempted fishing expedition must fail.

For their part, Plaintiffs admit that they do not know the details of Defendants' review, but they argue that the Court can infer a deficient process from the publicly available facts.  They point principally to the facts that (i) the plan uses MassMutual's own award-winning services and investment products, and (ii) a competitor allegedly offers cheaper investments than MassMutual.  These facts say nothing about Defendants' process, and support no inference of a deficiency.  Instead, Congress and the U.S. Department of Labor ("DOL") expressly authorize a financial services company like MassMutual to use its own products and investments, and court after court has held that just because a cheaper investment is available in the market does not mean that fiduciaries acted improperly by choosing alternatives especially where, like here, they offered employees a wide range of investments at different price points.  These innocent facts

raise no inference of a deficient process.

Further, Plaintiffs' claims are untimely and target improper Defendants.  Plaintiffs had access to all of the publicly available information that they use to support their erroneous inference of a deficient process well over three years ago.  Therefore, their claims are barred by ERISA's three-year statute of limitations, which was not at issue in *Tibble*.  (Said differently, Plaintiffs cannot have it both ways—they cannot simultaneously argue that (i) they have no actual knowledge of Defendants' process, but nonetheless can state a claim based on the public record, but (ii) the public record is irrelevant to the three-year limitations analysis because their claims challenge Defendants' process.)  *Tibble* also says nothing about claims other than imprudence, so it cannot salvage the Complaint's untimely counts brought under theories other than imprudence.  Finally, the Complaint continues to seek relief against a number of specific Defendants for whom no ERISA breach of fiduciary claim can be brought, such as one former CEO who is not alleged to have served on the fiduciary committee and who left the company more than ten years ago.  For all these reasons, the Complaint must be dismissed.

## BACKGROUND[1]

## I.    The MassMutual Thrift Plan

MassMutual is a highly-stable, broadly-diversified financial services company.[2]  The company's financial strength is rated in the highest category, A++, by A.M. Best Company.[3]

---

[1] Courts routinely consider ERISA plan documents and public filings containing pertinent information on Rule 12(b)(6) motions.  *See, e.g., Beddall v. State Street Bank and Trust Co.*, 137 F.3d 12, 16-17 (1st Cir. 1998); *In re Lernout & Hauspie Sec. Litig.*, 286 B.R. 33, 37 (D. Mass. 2002).  The Court may also consider "documents the authenticity of which are not disputed by the parties" and documents integral to Plaintiffs' claims, including the Plan's summary plan description ("SPD") and certain fee disclosures required under applicable DOL regulations. *See Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993); *cf. Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996); *In re Stillwater Capital Partners Inc. Litig.*, 858 F. Supp. 2d 277, 284 (S.D.N.Y. 2012).

[2] *See* MassMutual 2014 Annual and Corporate Responsibility Report ("2014 Annual Report") at 1, https://www.massmutual.com/~/media/files/annualreport.pdf.

[3] *See id.* at 7.  A.M. Best is a rating agency offering independent opinions on companies in the insurance industry. The A++ rating is the highest in the financial strength ratings and is "[a]ssigned to companies that have, in our

Through its numerous operating divisions and affiliates, MassMutual offers a broad spectrum of products, including investment and retirement products and services.[4]  As of December 31, 2014, MassMutual and its affiliates had more than $650 billion in assets under management.[5]  Some of the retirement products MassMutual markets and sells are designed for employer-sponsored retirement plans.  Compl. ¶ 31.  MassMutual's Retirement Services division ("MMRS") provides services to more than 35,000 retirement plans with more than $152 billion in retirement assets under management.[6]  It receives record satisfaction reports from its customers, and has been named "Retirement Leader of the Year" for industry leadership and excellence in retirement plan services by Fund Industry Intelligence (Euromoney Institutional Investor).[7]

Among the benefits that MassMutual offers to its own employees is the MassMutual Thrift Plan (the "Plan"), a "defined contribution" 401(k) plan.  Compl. ¶¶ 27, 34.  The Plan has over $1 billion in assets and 14,000 participants.  Compl. ¶ 28.  The Plan is governed by a written plan instrument.[8]  Under the terms of that document, each participant can elect how much, if any, of her salary to contribute to her individual Plan account.[9]  MassMutual also contributes to participants' Plan accounts, matching 100% of the first 5% of eligible

---

opinion, a superior ability to meet their ongoing insurance obligations."  A.M. Best, Best's Financial Strength Ratings Guide (2015), http://www3.ambest.com/ratings/default.asp (follow "Best's Financial Strength Rating: FSR" hyperlink).

[4] *See* 2014 Annual Report at 6.

[5] *See id.* at 13.

[6] *See* Press Release, MassMutual Retirement Services Earns Record Satisfaction Ratings from Plan Sponsors (May 20, 2015), https://www.massmutual.com/about-us/news-and-press-releases/press-releases/2015/05/20/10/20/massmutual-retirement-services-earns-record-satisfaction-ratings-from-plan-sponsors.

[7] *See id.*; Press Release, MassMutual Retirement Services Named "Retirement Leader of the Year" at 19th Annual Mutual Fund Industry Awards (Apr. 11, 2012), http://www.prnewswire.com/news-releases/massmutual-retirement-services-named-retirement-leader-of-the-year-at-19th-annual-mutual-fund-industry-awards-146967885.html.

[8] *See* MassMutual Thrift Plan, January 1, 2012 Restatement ("Plan Document") at MM-DG-00029, Declaration of Alison V. Douglass in Support of Defendants' Renewed Motion to Dismiss Plaintiffs' Class Action Complaint, submitted herewith ("Douglass Decl."), Ex. 1.

[9] *See id.* at MM-DG-00041, § 3.01.

compensation that the participant contributes to the Plan.[10]  In 2013, MassMutual contributed

approximately $40 million in matching contributions based upon approximately $83 million

contributed by participants.[11]  Each participant chooses how to invest the amounts contributed to

her Plan account among the investment options made available under the Plan.[12]

The Plan Document has long required that the investment options will be provided

through a MassMutual Group Annuity Contract ("GAC"), allowing participants access to the

same award-winning products and services MassMutual makes available to its customers.[13]  The

Plan vests the Investment Fiduciary Committee ("IFC") with responsibility for selecting the

Plan's investment options from those available through the GAC.  Compl. ¶ 9.[14]  At the time the

Complaint was filed, the Plan offered 38 investment options, including a guaranteed interest

account ("GIA") and 37 separate investment accounts (each an "SIA").  Compl. ¶¶ 66-67.  It

currently offers the GIA and 34 SIAs.[15]  All but one SIA is required to invest exclusively in a

specific, no-load mutual fund that is registered with and overseen by the U.S. Securities and

Exchange Commission ("SEC"); the remaining SIA is an account specially managed for the

---

[10] *See id.* at MM-DG-00045-46, § 3.02(a)(2); MassMutual Thrift Plan Summary Plan Description for Employees, Effective January 1, 2013 ("2013 SPD") at MM-DG-00134, Douglass Decl. Ex. 2.

[11] *See* MassMutual Thrift Plan Form 5500 for Year 2013 (Sept. 8, 2014) ("2013 Form 5500") at MM-DG-00416, Schedule H, Douglass Decl. Ex. 3.

[12] *See* Compl. ¶ 66; 2013 SPD at MM-DG-00136, Douglass Decl. Ex. 2.

[13] *See* Plan Document at MM-DG-00059, § 4.01(a), Douglass Decl. Ex. 1 ("The Company shall be a contractholder of one or more Group Annuity Contracts with Massachusetts Mutual Life Insurance Company for the investment of contributions under the Plan."); *id.* at MM-DG-00059, § 4.02 (requiring the investment of Plan assets in MassMutual separate investment accounts and guaranteed interest account); MassMutual Thrift Plan Group Annuity Contract No. SF 001550 (Dec. 12, 2011) at MM-DG-00189, § G1.01, MM-DG-00191-92, § S1.01, Douglass Decl. Ex. 4.  These provisions have long been part of the Plan.  *See* MassMutual Thrift Plan, May 1, 2004 Restatement ("2004 Plan Document") at MM-DG-00288, § 4.01(a), Douglass Decl. Ex. 5 (requiring investment of Plan assets in a GAC issued by MassMutual); *id.* at MM-DG-00265, § 1.27 (defining the "Funds" to be available to the Plan as those offered under the GAC); *id.* at MM-DG-00288, § 4.02 (requiring the investment of Plan assets in MassMutual SIAs and the GIA); *id.* at MM-DG-00322, § 10.03 (requiring the use of MMRS for administrative services).

[14] *See* Plan Document at MM-DG-00059, § 4.01(b)(1), Douglass Decl. Ex. 1.

[15] *See* MassMutual Thrift Plan Participant Fees Disclosure Statement (Sept. 4, 2014) ("Participant Disclosures") at MM-DG-00420-30, Douglass Decl. Ex. 6 (listing Plan options).

Plan. Compl. ¶ 79.[16]

The Plan's investment options offer participants a broad range of choice on the risk/return spectrum.[17]  The GIA offers a guaranteed rate of return backed by MassMutual's superior financial strength.[18]  The GIA rate is set prospectively on a semi-annual basis and is communicated to participants in advance of any rate change.[19]  In 2014, the GIA paid a guaranteed rate of return of 3.40%.[20]  The GAC provides a contractually-guaranteed minimum GIA interest rate of 3.00%.[21]

Through the SIAs, participants can invest in a broad array of index and actively-managed funds.[22]  Each SIA allows exposure to a different asset class, including stocks, bonds, real estate, and commodities through specific domestic and international funds.[23]  Unlike the GIA, investors in the SIAs are not guaranteed a rate of return and instead bear the investment risk and potential reward of those investments (net of fees).[24]  Fifteen of the Plan's SIAs are advised or sub-advised by one or more investment advisers that are not affiliated with MassMutual.[25]  These unaffiliated investment advisers include some of the premier investment management firms in

---

[16] *See also id.*  A no-load fund is one that does "not charge investors a fee to buy or sell shares.  Purchases and sales occur at net asset value, calculated daily.  A no-load fund covers its expenses by deducting them from the assets under management.  So if these assets appreciate 10% in a given year, and the expenses come to 1%, investors receive a net gain of 9%; if the assets decline 5% in the market, investors' net return is -6% that year."  *Loomis v. Exelon Corp.*, 658 F.3d 667, 669 (7th Cir. 2011).

[17] *See* 2013 SPD at MM-DG-00136, Douglass Decl. Ex. 2; Participant Disclosures at MM-DG-00420-30, Douglass Decl. Ex. 6.

[18] *See* GAC at MM-DG-00189, § G1.01, Douglass Decl. Ex. 4; *see also supra* n.3 and accompanying text.

[19] *See* Participant Disclosures at MM-DG-00189, Douglass Decl. Ex. 4; *see also* Compl. ¶ 86 ("MassMutual agrees to pay a set 6-month interest rate. . .").

[20] *See* Participant Disclosures at MM-DG-00421, Douglass Decl. Ex. 6.

[21] *See* GAC at MM-DG-00185, § 8.13, MM-DG-00189, § G1.01, Douglass Decl. Ex. 4.

[22] *See*, *e.g.*, Compl. ¶¶ 4, 79.

[23] *See* Compl. ¶ 79; Participant Disclosures at MM-DG-00422-30, Douglass Decl. Ex. 6.

[24] *See* Participant Disclosures at MM-DG-00422-30, Douglass Decl. Ex. 6.

[25] *See id.*

the world, including Wellington Management, Northern Trust, T. Rowe Price, JPMorgan Chase, and PIMCO.[26]

The Plan's wide range of SIA investment options incur a range of expenses—expressed as a percentage of assets invested in each fund (commonly referred to as the "expense ratio," which is an amount of expenses paid by the fund itself). The expenses have ranged from 0.08% for a fund designed to track the performance of the S&P 500 Index (the MassMutual Select S&P 500 Index Fund) to 1.13% for a sophisticated fund designed to invest in real estate investment trusts (the Oppenheimer Real Estate Fund). Compl. ¶ 79. The expenses associated with each of the SIA investment options are fully disclosed to participants and, in the case of the SIAs that invest in a single mutual fund, are also publicly available.[27]

Although the contract under which Plan services are provided, the GAC, allows for a fee of up to 2.00% to be assessed on the SIAs, Plaintiffs do not allege, nor could they, that their investments were ever actually assessed such a fee. *Cf.* Compl. ¶¶ 56-57 (referencing GAC). Instead, the 0.08% to 1.13% fees assessed to the SIA investment options reflect the participant's total costs for investment management and plan recordkeeping and administration.[28]

## II.   Plaintiffs' Allegations

Plaintiffs are current and former Plan participants who purport to assert claims on behalf of "the Plan, themselves and all similarly-situated Plan participants and beneficiaries." Compl. ¶ 106. Plaintiffs broadly challenge the selection of services and investment products for the Plan, alleging that it is the product of a biased and imprudent process. *See*, *e.g.*, Compl. ¶¶ 3, 7. They have sued

---

[26] *See id.*

[27] *See id.* (showing expense ratios for Plan investment options); MassMutual Select Funds Prospectus (Apr. 1, 2013) ("2013 Select Prospectus") at MM-DG-00225, Douglass Decl. Ex. 7 (prospectus excerpt for MassMutual Select S&P 500 Index Fund showing fund expenses).

[28] Participants may also pay transaction fees, such as fees in connection with Plan loans, if they elect such transactions. However, Plaintiffs do not complain about fees for such elective, additional services.

MassMutual, members of both the IFC and the Plan Administrative Committee ("PAC"),[29]

MassMutual's current and former Chief Executive Officers ("CEOs"), and the head of MMRS.

Counts I and II allege that Defendants breached their fiduciary duties of prudence and

loyalty under ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), through the

"imposition of unreasonable recordkeeping and administrative fees" and the "selection of

unreasonably-priced and imprudent investment options."  Compl. ¶¶ 109-31.  Counts III and IV

allege that by entering into contracts with MassMutual, Defendants engaged in prohibited

transactions under ERISA §§ 406(a) and 406(b), 29 U.S.C. §§ 1106(a) and (b).  Compl. ¶¶ 132-

63.  Count V alleges that Defendants violated ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D),

by allowing Plan expenses to be paid out of participant accounts.  Compl. ¶¶ 164-72.  Count VI

alleges that the CEOs "fail[ed] to monitor fiduciaries."  Compl. ¶¶ 173-80.  Count VII seeks

"other remedies" for breach of fiduciary duty, including an accounting of all transactions,

disbursements and dispositions in connection with the Plan and its assets; surcharge against

Defendants; disgorgement of profits, including profits received by subsidiaries and affiliates; and

further injunctive and other equitable relief.  Compl. ¶¶ 181-98.

III.    **Procedural History**

Defendants filed their initial motion to dismiss the Complaint on January 14, 2014.  Doc.

20.  The motion was fully briefed and the Court heard oral argument on October 8, 2014.  At the

time of the argument, a Ninth Circuit decision concerning the application of ERISA's six-year

statute of repose, *Tibble v. Edison Int'l*, 729 F.3d 1110 (9th Cir. 2013), *vacated*, 135 S. Ct. 1823

(2015), was pending before the Supreme Court.  On March 30, 2015, the Court denied

Defendants' motion to dismiss without prejudice and stayed the matter pending issuance of the

---

[29] The PAC is responsible for Plan administration.  Compl. ¶ 44(B).

Supreme Court's decision in *Tibble*.  Doc. 67.  The Court allowed Defendants to "file a renewed motion to dismiss within thirty days of the Supreme Court's *Tibble* ruling, including an analysis of the impact of that decision."  *Id.*  *Tibble* was decided on May 18, 2015.  135 S. Ct. 1823.  On May 21, 2015, the Court entered an order allowing Defendants to have until July 2, 2015 to file the instant motion, renewing Defendants' motion to dismiss.  Doc. 69.

## ARGUMENT

### I.    Plaintiffs Have Not Plausibly Pleaded Any ERISA Violation.

The Complaint should be dismissed because it fails to state a claim.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Rederford v. U.S. Airways, Inc*., 589 F.3d 30, 35 (1st Cir. 2009) (same).  A complaint fails if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct . . . ."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  A plaintiff must provide "direct or inferential allegations respecting all the material elements" of her claims.  *Twombly*, 550 U.S. at 562.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of' . . . [demonstrating] 'entitlement to relief,'" particularly where there is an "obvious alternative explanation" for the challenged conduct.  *Iqbal*, 556 U.S. at 678, 682; *see also Sepúlveda-Villarini v. Dept. of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010) (the "combined allegations, taken as true, must state a plausible, not merely conceivable, case for relief").  Allegations should not be credited if they are conclusory or contradicted by documents relied upon in the complaint.  *Iqbal*, 556 U.S. at 678 (conclusory statements); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 56 (1st Cir. 2012) (documents contradicting complaint).

### A.  Counts I and II Fail Because Plaintiffs Plead No Breach of Fiduciary Duty.

Counts I and II fail because Plaintiffs do not plausibly plead that Defendants acted disloyally or imprudently in selecting and retaining MassMutual products for the Plan.  The Complaint contains no allegations at all as to the process employed by Defendants, and the circumstantial facts they plead stop well short of demonstrating any entitlement to relief.

#### 1.  Plaintiffs Plead No Direct Fact of Any Deficiency In Defendants' Process, as Required by *Tibble*.

The starting point of analysis, appropriate given the posture of this case, is with the Supreme Court's decision in *Tibble*.  In that case, the Court vacated a holding that ERISA's six-year statute of repose barred claims challenging the prudence of certain share classes of mutual funds in a large 401(k) plan.  The Supreme Court held that the Ninth Circuit erred by failing to "recognize that under trust law a fiduciary is required to conduct a regular review of its investment." *Tibble*, 135 S. Ct. at 1827-28.  The Supreme Court explained that, under trust law applicable to ERISA, once investments are selected, the fiduciary must "consider" the investments "at regular intervals." *Id.* at 1828 (citing A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees § 684, pp. 147-48 (3d ed. 2009)).  In short, a fiduciary has a "duty to watch the investment with reasonable care and diligence." *Id.* (quoting *Johns v. Herbert*, 2 App. D.C. 485, 499 (1894)).

The Supreme Court's focus on fiduciary process in evaluating a claim of imprudence is consistent with this circuit's precedents.  "The test of prudence—the Prudent Man Rule—is one of *conduct*, and not a test of the result of performance of the investment." *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009) (quoting *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983)) (emphasis in original).  According to the Restatement (Third) of Trusts, "[t]he test of prudence is one of conduct not of performance." *Id.*, § 77 cmt. a (2007).

Here, Counts I and II fail entirely because the Complaint pleads no facts concerning the process employed by Defendants to select or monitor Plan investments.  Plaintiffs admit that they "have no idea how [D]efendants have been running the plan."  Doc. 64 at 21:5-6.  They ask to be relieved of their pleading burden and open the door to discovery—with all of its asymmetrical burdens on Defendants—based on nothing more than conjecture.  *See* Doc. 32 at 2-3 (seeking "latitude").  This type of conjecture-based plea has been consistently rejected by the appellate courts, and should be rejected here as well.

In *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 719 (2d Cir. 2013), the Second Circuit held that an ERISA claimant's lack of knowledge about a defendant's fiduciary process cannot justify a relaxed pleading standard, especially given the role that Rule 12(b)(6) plays in preventing expensive strike suits based on nothing more than speculation:

> the prospect of discovery in a suit claiming breach of fiduciary duty is ominous, potentially exposing the ERISA fiduciary to probing and costly inquiries and document requests about its methods and knowledge at the relevant times.  This burden, though sometimes appropriate, elevates the possibility that a plaintiff with a largely groundless claim [will] simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence. . . .  Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure, as interpreted in *Twombly* and *Iqbal*, help to prevent settlement extortion—using discovery to impose asymmetric costs on defendants in order to force a settlement advantageous to the plaintiff regardless of the merits of his suit.

Outside of the ERISA context, the Sixth Circuit explained that *Twombly* is not relaxed "even when the information needed to establish a claim . . . is solely within the purview of the defendant or a third party."  *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011) (citing *Iqbal*, 556 U.S. at 686).[30]  District courts have followed suit.  For

---

[30] Indeed, *Twombly* itself concerned circumstances similar to those here—where plaintiffs might not have access to certain information pre-discovery. The *Twombly* plaintiffs did not possess evidence concerning defendants' decision-making process or alleged anti-competitive agreements, and, like here, based their claim on circumstantial facts. *See Twombly*, 550 U.S. at 551.  The Court required plaintiffs to allege facts giving rise to a plausible

example, in *Felder v. WMATA*, No. CV 14-01905 (TFH), 2015 WL 2447342, at *5 (D.D.C. May

21, 2015), the son of a decedent brought claims arising from the rail accident that killed his

father, including for negligent training and supervision.  The court rejected the plaintiff's

assertion that he needed discovery to learn about the defendant's training policies and

procedures—facts unknown to plaintiff when he commenced suit—to demonstrate the existence

of claim:  "A plaintiff may not . . . use discovery to obtain the facts necessary to establish a claim

that is plausible on its face pursuant to *Twombly* and *Iqbal*—even when those facts 'are only

within the head or hands of the defendant.'"  *Id.* at *5 (dismissing claim) (quoting *New Albany

Tractor*, 650 F.3d at 1051).

Given that Plaintiffs do not plead any fact that would support a finding of an imprudent

or disloyal fiduciary process, Counts I and II should be dismissed under Rule 12(b)(6).

### 2.    Plaintiffs Plead No Circumstantial Facts to Support Any Plausible Inference of a Fiduciary Breach.

Unable to plead any actual defect in Defendants' selection or monitoring process,

Plaintiffs ask the Court to infer from various Plan attributes that they have stated a plausible

claim of a deficient process.  But none of the circumstantial facts they allege about the Plan's (1)

fees, (2) use of proprietary MassMutual products, or (3) performance "nudge" their claims of a

deficient process "across the line from conceivable to plausible."  *Iqbal*, 556 U.S. at 680 (quoting

*Twombly*, 550 U.S. at 570).

*First*, the Complaint asserts that cheaper funds were available from  a competitor,

Vanguard.  Compl. ¶ 79.  This fact is meaningless.  "[N]othing in ERISA requires every

fiduciary to scour the market to find and offer the cheapest possible fund (which might, of

---

inference of anticompetitive conduct: it is "only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery."  *Id.* at 559.

course, be plagued by other problems)." *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir.

2009) (affirming dismissal).   Courts have specifically rejected analogous claims of fiduciary

breach as to funds with expenses higher than Vanguard mutual funds, a competitor that attempts

to distinguish itself on the basis of fees.   *See Amron v. Morgan Stanley Inv. Advisors Inc.*, 464

F.3d 338, 345-46 (2d Cir. 2006) (upholding dismissal of Investment Company Act claims based

on allegation that Vanguard offered a cheaper fund); *Reso Artisan Int'l Fund v. Artisan Partners

Ltd. P'ship*, No. 11-CV-873-JPS, 2011 WL 5826034, at *8 (E.D. Wis. Nov. 18, 2011) (calling

comparisons to Vanguard "of little value").[31]   Nothing in ERISA bars every financial firm except

one low cost provider based in Pennsylvania from offering investments to retirement plans.[32]

Furthermore, the fees here are well within the range that appellate courts have held do not

support a claim of breach.   The Plan offers a total cost of participation in the range of eight to

113 basis points (0.08% to 1.13% of fund assets), depending on the funds that the participants

select.   In *Hecker*, 556 F.3d at 583-86, the Seventh Circuit affirmed dismissal of claims that the

defendants breached fiduciary duties by offering only mutual funds with expense ratios ranging

from seven to 100 basis points.   The court held that "no rational trier of fact could find, on the

basis of the facts alleged in th[e] Complaint, that [defendants] failed to satisfy [the duty to

furnish an acceptable array of investment vehicles]."   *Id.* at 586.   The Third Circuit likewise

---

[31] *See also Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1231 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991) ("there are . . . significant differences in structure, peculiar to the Vanguard family of funds, which lessen the value of the comparison"); *Turner v. Davis Select Advisers LP*, 4:08-cv-00421-AWT, slip op. at 14-15 (D. Ariz. June 1, 2011) (disregarding comparison with Vanguard, which is "known in the industry for having low fees").

[32] The Complaint also asserts generally that the Plan could have used investment vehicles other than mutual funds or avoided funds that employ a sub-advisory structure.  Compl. ¶¶ 75-78.  These theories have been consistently rejected by appellate courts.  *See, e.g.*, *Loomis*, 658 F.3d at 675 (affirming dismissal of complaint alleging that plan with $1 billion in assets should have offered separate accounts and commingled trusts instead of mutual funds); *Renfro*, 671 F.3d at 326-28 (affirming dismissal of complaint alleging that fiduciaries of a very large plan should have insisted on better fee structure than that offered by mutual funds).  In short, "[t]he total fee, not the internal, post-collection distribution of the fee, is the critical figure for someone interested in the cost of including a certain investment." *Hecker*, 556 F.3d at 586.

12

dismissed claims concerning funds offered to a large plan at a range of 10 to 121 basis points in

*Renfro v. Unisys Corp.,* 671 F.3d 314, 319 (3d Cir. 2011).[33]

    *Second*, the mere fact that the Plan utilizes proprietary products and services does not

support an inference of an imprudent or disloyal process because such arrangements are required

by the Plan Document and are expressly authorized under ERISA and by the DOL.

    The plan document is "at the center of ERISA" and is the "linchpin" of ERISA fiduciary

obligations. *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 134 S. Ct. 604, 612 (2013). In this

circuit, "there can be no breach of fiduciary duty where an ERISA plan is implemented

according to its written, nondiscretionary terms." *Alves v. Harvard Pilgrim Healthcare Inc.*, 204

F. Supp. 2d 198, 210 (D. Mass. 2002), *aff'd*, 316 F.3d 290 (1st Cir. 2003). Here, the Plan

expressly provides that "persons employed by [MMRS] shall be responsible for and shall

perform all administrative duties contemplated by the Plan . . . ."[34] The Plan also expressly

requires that Plan assets be invested in contracts issued by MassMutual, and that the "Funds" to

be offered to Plan participants be "investment options available under [the GAC]."[35] It further

provides expressly that Plan assets shall be invested in MassMutual SIAs and the GIA.[36]

---

[33] *See also Loomis*, 658 F.3d at 673-74 (a plan that "offer[s] participants a menu that includes high-expense, high-risk, and potentially high-return funds, together with low-expense index funds that track the market" does not state a claim because such a plan "has left choice to the people who have the most interest in the outcome"). These cases also reject another ground asserted by Plaintiffs to try to nudge the claims across the plausibility line, that the Plan pays asset-based fees (Compl. ¶ 59). *See Renfro*, 671 F.3d at 326-28 (rejecting plaintiff's claim that asset-based fees are imprudent); *Loomis*, 658 F.3d at 672-73 (rejecting allegations of imprudence of asset-based fees because "flat payments per participant may help some participants but hurt others, depending on the size of each participant's account"); *Hecker*, 556 F.3d at 585 (agreeing with lower court that asset-based fee arrangement "violates no statute or regulation").

[34] Plan Document at MM-DG-00092, § 10.03, Douglass Decl. Ex. 1.

[35] *Id.* at MM-DG-00035, § 1.32, MM-DG-00059, § 4.01(a).

[36] *Id.* at MM-DG-00059, § 4.02. That the Plan requires the use of MassMutual products is not cited as a complete defense to the claim of imprudence, given the recent observation of the Supreme Court that "the duty of prudence trumps the instructions of a plan document." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2468 (2014). However, the pleaded fact that the Plan is administered in compliance with the requirements of the Plan Document is an "obvious alternative explanation" for the challenged conduct, *Iqbal*, 556 U.S. at 678, 682, and is not sufficient to support a claim.

13

In addition, ERISA expressly authorizes an insurer like MassMutual to utilize its own products for its own employee benefit plan.  Congress has recognized that "it would be contrary to normal business practice to require the plan of an insurance company to purchase its insurance from another insurance company."[37]  Indeed, it is "common practice" for financial services companies to invest their own plans' assets in their own investment funds.[38]  The principal regulator of retirement plans, the DOL, has also long recognized that it would be "contrary to normal business practice for a company whose business is financial management to seek financial management services from a competitor."[39]  The DOL has determined in several contexts that a plan's investment in the sponsor's financial products is "in the interests of plans and of their participants and beneficiaries" and "protective of the rights of participants and beneficiaries of Plans."[40]

As explained by one court in another case where an insurer was sued for utilizing its own GAC and investment products in the plan covering its own employees, the fact that defendants "followed such a practice—the very result Congress [and the DOL] intended to approve by enacting the[se] exemptions—does not give rise to an inference of" a fiduciary violation. *Dupree v. The Prudential Ins. Co. of Am.*, No. 99-8837-Civ.-JORDAN, 2007 WL 2263892, at *45 (S.D. Fla. Aug. 7, 2007) (emphasis added).

---

[37] *See* H.R. Rep. No. 93-1280 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5094 ("ERISA Conf. Rep.")

[38] *Id.* at 5096.

[39] Participant Directed Individual Account Plans, 56 Fed. Reg. 10,724, 10,730 (Mar. 13, 1991) (citing as an example Prohibited Transaction Exemption 77-3), discussed below at Section I.B., *infra*.

[40] Class Exemption Involving Mutual Fund In-House Plans Requested by the Investment Company Institute, 42 Fed. Reg. 18,734 (Apr. 8, 1977) ("PTE 77-3"); *see also* Class Exemption to Permit Sales of Employee Benefit Funding Contracts by Insurance Companies That Are Substantially Affiliated with Employers Maintaining the Plans, 44 Fed. Reg. 46,365 (Aug. 7, 1979) (extending "administrative relief previously provided for transactions involving 'in-house' plans of other types of financial institutions" to insurance companies) ("PTE 79-41").

*Third*, the performance of the Plan's funds also does not support any inference of a deficient process.  Plaintiffs assert that "not one fund in the Plan performed in the upper third of its style category for any consecutive five-year period" and that the Plan's Investment Policy Statement ("IPS") required removal of such funds.  Compl. ¶ 99.  But Plaintiffs' sweeping assertion is not supported by a single allegation about the performance history of any specific fund, its benchmark, or the magnitude of any purported underperformance.  Moreover, Plaintiffs' allegation misconstrues the IPS, which does not require removal of funds that fail to outperform two-thirds of their peers.  Instead, the IPS mandates an "in-depth review" of such funds by the Plan fiduciaries.[41]  Plaintiffs fail to plead that such review did not occur or that any such review was inadequate.  As the Second Circuit recently held in affirming dismissal of ERISA claims alleging underperformance, the mere fact of underperformance does not plausibly imply that a plan fiduciary failed to adequately review an investment option.  *Pension Benefit Guar. Corp.*, 712 F.3d at 722 (decline in market value of portfolio due to concentration in sub-prime securities does not raise an inference that defendant failed to evaluate the fund).

The Complaint's further allegation that the Capital Appreciation Fund and the Large Cap Value Fund "have a history of significant underperformance for years, underperforming their respective benchmarks and prudent investment options available to the Plan by over $10 million each in the past six years alone" (Compl. ¶ 96) also is too conclusory to state a claim of an insufficient process even as to those two funds.  Plaintiffs do not plead these two funds' respective benchmarks, or how or for what periods of time during the last six years either fund underperformed its benchmark.  Nor do Plaintiffs link such alleged underperformance to any of their own investments, or allege that any member of the putative class was harmed by such

---

[41] *See* Investment Policy Statement for the MassMutual DC Plans, as Amended and Restated Effective December 15, 2012, at MM-DG-00407-08, Douglass Decl. Ex. 8.

investment.  In *Leber v. Citigroup, Inc.*, the court dismissed virtually identical claims that alleged

"millions of dollars" in plan underperformance, holding that "plaintiffs' allegation that the

committee defendants breached duties of prudence and care by selecting affiliated mutual funds

that 'substantially under-performed similar products available from unaffiliated investment

managers' is supported by nothing beyond plaintiffs' bare assertion," and, thus, could not

support a claim for breach of fiduciary duty.  No. 07 Civ. 9329 (SHS), 2010 WL 935442, at *14

(S.D.N.Y. Mar. 16, 2010).[42]

 In short, none of the attributes of the Plan's SIA investments gives rise to *any* plausible

inference of an insufficient fiduciary process.

### 3.  Plaintiffs Fail to Plead that Inclusion of the GIA Violates ERISA.

 The Complaint also fails to state a claim for imprudence or disloyalty as to the Plan's

GIA investment option.

 Plaintiffs allege that the GIA exposed participants to imprudent and undiversified risk,

and that Defendants benefited from GIA investments through the assessment of fees, the

acquisition of $500 million in "working capital" for MassMutual's general account, and the

retention of the "spread" between MassMutual's earnings on the general account and the rate

paid on the GIA.  Compl. ¶¶ 82-94.  These allegations fail as a matter of law.

 *First*, Plaintiffs make no plausible allegation that the GIA exposed participants to undue

risk without sufficient compensation.  No participant was required to invest in the GIA.

---

[42] Since the Capital Appreciation Fund and the Large Cap Value Fund have been available as investment options in the Plan for more than six years, any claims as to their initial selection are specifically time-barred.  *See* 2006 Form 5500 at MM-DG-00387-88, Schedule D, Douglass Decl. Ex. 9.  In the unlikely event that claims as to these two funds can proceed, that would not resurrect the remaining claims in the Complaint as to other investments, and the case should be correspondingly narrowed to focus only on those two funds.

Participants who chose to invest in the GIA received a guaranteed rate of return.[43]  This

guaranteed return is backed by the financial strength of MassMutual—a credit-worthy insurance

company that is rated in the highest category, A++, by A.M. Best.[44]  Plaintiffs do not and cannot

plead that MassMutual has ever failed to meet its obligations under the GIA.  The mere

allegation that the risk profile of the GIA is different than synthetic guaranteed investment

contracts (Compl. ¶¶ 90, 94(B))—which would not be at all surprising given that the products are

very different—does not render imprudent or disloyal Defendants' decision to follow the Plan

Document and allow participants to decide for themselves whether to invest in the GIA.[45]

*Second*, Plaintiffs' allegation that the GIA's supposed risk and recordkeeping charges

"exceed[] the market rate for comparable products" (Compl ¶ 88) fails to state a claim.  As the

DOL noted when it exempted such products from its fee disclosure rules, "[t]he most essential

information for . . . fixed investment alternatives is the contractual interest rate paid to

[participant] accounts and the term of the investment during which [participant] monies are

shielded from market price fluctuations and reinvestment risks."  Fiduciary Requirements for

Disclosure in Participant-Directed Individual Account Plans; Final Rule, 75 Fed. Reg. 64910,

64916 (Oct. 20, 2010).  In other words, it is the fixed return, not the costs incurred in generating

---

[43] *See* Participant Disclosures at MM-DG-00421, Douglass Decl. Ex. 6 (3.40% rate in 2014); GAC at MM-DG-00189, § G1.01, Douglass Decl. Ex. 4 (setting 3.00% minimum).

[44] *See supra* n.3.

[45] Plaintiffs' assertion that inclusion of the GIA in the Plan is imprudent because it exposed the Plan to "undiversified risk" (Compl. ¶ 84) is also meritless.  The GIA is an investment in MassMutual's general account and the Complaint admits that the general account is a diversified "pool of assets . . . comprised of various investments including commercial mortgages, publicly-issued bonds, asset-backed securities, and privately-issued debt securities."  Compl. ¶ 83.  Congress and the DOL routinely consider the underlying investments (*i.e.*, assets held in the general account) in evaluating whether diversification has been satisfied.  *See, e.g.*, ERISA Conf. Rep. at 305 ("generally a plan may be invested wholly in insurance or annuity contracts without violating the diversification rules, since generally an insurance company's assets are to be invested in a diversified manner"); DOL Opinion Letter 77-46 to Mr. Federic S. Kramer, Nat'l Ass'n of Mut. Sav. Bank (June 7, 1977), http://www.fdic.gov/regulations/examinations/trustmanual/appendix_e/e_ao.html (same); 29 C.F.R. §§ 2550.404c-1(b)(3)(ii), (e)(1)(iii) ("a fixed rate investment contract of an insurance company" is a "look-through investment vehicle" for diversification purposes and the underlying investments of such vehicles are considered for diversification purposes).

such returns, that matters for the GIA.  But Plaintiffs' claims fail to take into account the rate of

return that the GIA pays, or the fact that that rate of return is net of all expenses.[46]  Nor do they

even attempt to identify any "comparable products" backed by a 163-year-old company, rated

A++ by A.M. Best, that pay an annual return in excess of 3.40% in today's low interest rate

environment.

*Third*, Plaintiffs' allegation that Defendants breached fiduciary duties by crediting to the

Plan the contractual interest rate on the GIA, but not crediting the Plan with any additional

earnings MassMutual earned in its general account (Compl. ¶ 89), also fails to state a claim

under any legal theory developed "in the history of American jurisprudence"—as this Court

recently observed in a related context.  *In re Prudential Ins. Co. of Am. SGLI/VGLI Contract

Litig.*, No. 3:11-md-02208-MAP, slip op. at 2 (D. Mass. Nov. 22, 2013).

Plaintiffs are not entitled to recover earnings on MassMutual's general account because

assets in an insurer's general account are not ERISA plan assets.  ERISA specifically exempts

from its definition of "plan assets" the general account of an insurer that issues a "guaranteed

benefit policy" to a plan.  ERISA § 401(b)(2), 29 U.S.C. § 1101(b)(2).[47]  A "guaranteed benefit

policy" is defined as an "insurance policy or contract to the extent that such policy or contract

provides for benefits the amount of which is guaranteed by the insurer."  ERISA § 401(b)(2)(B),

29 U.S.C. § 1101(b)(2)(B).  In other words, a guaranteed benefit policy itself is an asset of the

plan, but the assets held by an insurer in its general account are not.  *See Merrimon v. Unum Life

Ins.*, 758 F.3d 46, 56 (1st Cir. 2014).  The Supreme Court has stated that the exclusion applies so

---

[46] The GAC provides that the GIA fixed rate of return shall never fall below 3.00%, after expenses.  GAC at MM-DG-00189, § G1.01, Douglass Decl. Ex. 4.  In fact, participants who chose to invest in the GIA have, at times, received more than the guaranteed minimum 3.00% rate of return, but they can never receive less.  *See* Participant Disclosures at MM-DG-00421, Douglass Decl. Ex. 6 (GIA rate paid for 2014 was 3.40%).

[47] ERISA § 401(b)(2) provides: "In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer."

long as "the insurer provides a genuine guarantee of an aggregate amount of benefits payable to . . . participants" and participants are not at risk that their benefits "can fall to zero." *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 105-06 (1993).

Here, the GIA provides a guaranteed benefit in the form of preservation of principal and a return of at least 3.00% as described in the GAC, with all the prospective investment risk (upside and downside) borne by MassMutual, not the Plan participants.[48]  MassMutual is required to return the principal and the promised interest regardless of the expenses MassMutual incurs in investing the assets that support the GIA and regardless of the actual return on those assets within the general account.  Plaintiffs can plead no cognizable legal injury based on receiving this fixed benefit, and have no claim with respect to MassMutual's general account.  *In re Prudential Ins. Co. of Am. SGLI/VGLI Contract Litig.*, slip op. at 1-2 (recipients of an insurance product paying a fixed rate are not entitled to the investment returns on an insurer's general account).[49]

* * *

Plaintiffs' circumstantial allegations concerning the SIAs and GIA fail to nudge their claims of a deficient fiduciary process across the line of plausibility.  Accordingly, Counts I and II should be dismissed.

---

[48] *See* GAC at MM-DG-00189, § G1.01, Douglass Decl. Ex. 4.

[49] *See also Mack Boring & Parts v. Meeker Sharkey Moffitt*, 930 F.2d 267, 270-76 (3d Cir. 1991) (affirming dismissal on the ground that assets maintained pursuant to a guaranteed benefit policy were not plan assets); ERISA Conf. Rep. at 296, Joint Explanatory Statement of the Conference Committee ("An insurance company . . . is not considered to hold plan assets if a plan purchases an insurance policy from it, to the extent that the policy provides payments guaranteed by the company."); *cf. Teets v. Great-West Life & Annuity Ins. Co.*,  Civil Action No. 14-2330, 2015 WL 2455464, at *3 (D. Col. May 22, 2015) (no exemption from ERISA's plan asset rule where guaranteed income contract provided that participants' benefit in the form of an interest rate could be reduced to 0%); *Peoria Union Stock Yards Co. Ret. Plan v. Penn. Mut. Life Ins. Co.*, 698 F.2d 320, 327 (7th Cir. 1983) (no exemption where contract did not guarantee a "fixed payout").

### B.       Counts III and IV Fail Because Plaintiffs Fail to State Prohibited Transaction Claims.

Plaintiffs' prohibited transaction claims fail because ERISA expressly exempts the use of MassMutual's GAC and investments, and Plaintiffs fail to plead that the conduct here falls outside the relevant exemptions.

The retention of MMRS as a service provider to the Plan through the Plan's purchase of the GAC is expressly exempted from the prohibitions of §§ 406(a) and (b) by ERISA § 408(b)(5), which allows plans sponsored by insurance companies to acquire the sponsor's annuity contracts, provided that the plan pays no more than "adequate consideration."[50]  ERISA § 3(18)(B) defines "adequate consideration" as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary."  29 U.S.C. § 1002(18)(B).  The Complaint's allegation that cheaper products and services are available in the market does not plausibly challenge the fair market value for the GAC—*e.g.*, the price paid by other investors in MassMutual GACs for similar investments and services.  Accordingly, the purchase of the GAC is specifically exempt from any prohibited transaction.

An additional regulatory exemption permits the SIAs to invest in affiliated mutual funds. PTE 77-3 allows "the acquisition and sale of shares of a . . . 'mutual fund' by an employee benefit plan which covers employees of the mutual fund or the mutual fund's investment adviser. . . ."[51]  PTE 77-3 includes four conditions, none of which is alleged to be violated here.[52]

---

[50] Specifically, ERISA § 408(b)(5) allows a fiduciary to obtain for a plan (1) "[a]ny contract for life insurance, health insurance, or annuities," (2) from an "insurer or insurers [that are] the employer maintaining the plan," (3) "which are qualified to do business in a State," (4) "if the plan pays no more than adequate consideration."  29 U.S.C. § 1108(b)(5).  PTE 79-41 also allows the sale of annuity contracts by an insurance company to an affiliated plan so long as the plan pays no more than "adequate consideration."  44 Fed. Reg. at 46,369.  ERISA § 408(b)(8) further exempts the purchase or sale of interests in a pooled investment fund of an insurance company, provided that the party receives only reasonable compensation, among other requirements.  Because the Plan invests in the SIAs and pooled investment funds of an insurance company, this exemption is also available.  29 U.S.C. § 1108(b)(8).

[51] PTE 77-3, 42 Fed. Reg. at 18,734.

Where, as here, the allegations concerning a plan's use of proprietary investments are consistent with available exemptions, and the complaint fails to plausibly plead that the defendant violated the conditions of the exemptions, courts have sensibly dismissed ERISA prohibited transaction claims at the pleading stage without requiring expensive discovery to prove that the exemptions are satisfied. *See, e.g., Mehling v. N.Y. Life Ins. Co.*, 163 F. Supp. 2d 502, 510-11 (E.D. Pa. 2001) (dismissing claim because "[p]laintiffs do not allege that the fees paid by the Plans are not in compliance with the requirements of PTE 77-3, or that the Plans have had dealings with the . . . [f]unds on terms that are less favorable than are offered to other shareholders"); *Leber*, 2010 WL 935442, at *10 (dismissing claim because, "even in the light most favorable to plaintiffs, the complaint asserts nothing more than that defendants purchased shares in an affiliated mutual fund, a transaction to which 'the restrictions of section [] 406 . . . shall not apply'").[53]

Because the Complaint does not plead any facts that would defeat the statutory exemptions to prohibited transaction claims, Counts III and IV should be dismissed.

**C.    Count V Fails Because Plaintiffs Fail to Allege a Violation of the Plan Document.**

Count V asserts that Defendants violated the terms of the Plan by allowing participant accounts to pay Plan expenses.  Compl. ¶¶ 164-72.  This claim is refuted by the Plan Document.

ERISA § 404(a)(1)(D) requires fiduciaries to administer the Plan in accordance with plan documents.  The core conduct challenged in the Complaint—use of MMRS services

---

[52] The four conditions are that "(a) The plan does not pay any investment management, investment advisory or similar fee to such investment adviser, principal underwriter or affiliated person . . . (b) The plan does not pay a redemption fee in connection with the sale by the plan to the investment company of such shares . . . (c) . . . the plan does not pay a sales commission . . . [and] (d) All other dealings between the plan and the investment company, the investment adviser or principal underwriter for the investment company, or any affiliated person of such investment adviser or principal underwriter, are on a basis no less favorable to the plan than such dealings are with other shareholders of the investment company." *Id.* at 42 Fed. Reg. at 18,735.

[53] *See also Skin Pathology Assocs., Inc. v. Morgan Stanley & Co.*, 27 F. Supp. 3d 371, 374-78 (S.D.N.Y. 2014) (dismissing complaint based on ERISA § 408(b)(2) exemption and pertinent DOL regulations).

through the GAC and use of the GAC's investment options for the Plan—was, in fact, ***mandated***

by the Plan Document.  *See* Plan Document at §§ 1.32, 4.01(a), 4.02, 10.03, Douglass Decl. Ex.

1.  Nonetheless, the Complaint alleges that Defendants violated a separate requirement of the

Plan Document, one that states that "all expenses of establishing and administering the plan,

including expenses with respect to the group annuity contract and fixed income account

agreement, shall be borne by the employer as a further contribution to the plan."  Compl. ¶ 166

(quoting a portion of Plan Document § 10.11(a) (Payment of Expenses)).  This allegation fails.

The Complaint selectively quotes one subsection of the document, and omits that the

cited language is preceded by the express modification, "[e]xcept as provided below."  The very

next provision of the Plan Document provides:  "To the extent that expenses are not paid by the

Employer, ***they shall be deducted from Participant Accounts***."[54]  The only fees for the Plan are

those assessed to participant investments—entirely consistent with this provision.

Even absent the omitted language, the Ninth Circuit held that a similar plan provision

requiring the plan sponsor to pay the plan's administrative costs did not preclude the payment of

such costs through mutual fund expenses.  *Tibble*, 729 F.3d at 1127, 1130.  The court held—in a

portion of its decision that was undisturbed by the Supreme Court—that the "commonsense

reading" of such a provision is that the plan sponsor would pay any bills submitted to it, not that

such provision barred mutual fund investments (such as those held in the SIAs here) from using

some portion of its fees to defray plan expenses.  *Id.* at 1130.  As such, Count V fails.

* * *

The remaining counts of the Complaint, Counts VI and VII, are derivative of the claims

asserted in Counts I-V.  Since each of the predicate Counts fails for the reasons stated herein,

---

[54] Plan Document at MM-DG-00095, § 10.11(b), Douglass Decl. Ex. 1 (emphasis added).

Counts VI and VII should also be dismissed.  *See*, *e.g.*, *In re Citigroup ERISA Litig.*, 662 F.3d

128, 145 (2d Cir. 2011) (dismissing derivative claims for complaint's failure to state underlying

claims under ERISA), *abrogated on other grounds by Dudenhoeffer*, 134 S. Ct. 2459 (2014).

## II.     Plaintiffs' Claims Are Time-Barred.

### A.     Plaintiffs' Claims Are Entirely Barred by ERISA's Three-Year Statute of Limitations.

Aside from Plaintiffs' failure to state a claim as to any Count, the Complaint also should

be dismissed under ERISA's three-year limitations period.  The concession at oral argument by

Plaintiffs' counsel that the facts that support their purported claims all exist outside of

Defendants' process establishes the untimeliness of their claims.  Because the Supreme Court in

*Tibble* addressed only ERISA's six-year statute of repose, nothing in its holding affects this

separate ground for dismissal.

ERISA § 413(2) precludes claims that are filed more than "three years after the earliest

date on which the plaintiff had actual knowledge of the breach or violation."  29 U.S.C.

§ 1113(2).  In determining "actual knowledge," courts have "focused on whether documents

provided to plan participants sufficiently disclosed the alleged breach of fiduciary duty, not

whether the individual plaintiffs actually saw or read the documents."  *Young v. Gen. Motors Inv.

Mgmt. Corp.*, 550 F. Supp. 2d 416, 418-19 (S.D.N.Y. 2008) (dismissing claims), *aff'd on other

grounds*, 325 F. App'x 31 (2d Cir. 2009).  The First Circuit has explained that it does "not think

Congress intended the actual knowledge requirement [of the ERISA statute of limitations] to

excuse willful blindness by a plaintiff."  *Edes v. Verizon Commc'ns, Inc.*, 417 F.3d 133, 142 (1st

Cir. 2005).  Earlier this year, Judge Koeltl held that ERISA breach of fiduciary duty claims were

barred at the pleading stage by ERISA's three-year limitations period where the claims were

based on information that was publicly available more than three years prior to the filing of the

complaint. *In re Citigroup ERISA Litig.*, __ F. Supp. 3d __, No. 11 CV 7672 JGK, 2015 WL 2226291, at *9 (S.D.NY. May 13, 2015) (dismissing complaint).

Here, Plaintiffs' counsel conceded at oral argument that their claims are based entirely on circumstantial facts that were provided to participants or were publicly available: "[a]ll they see is from the outside." Doc. 64, at 21-22. Plaintiffs have been informed for far more than three years that the Plan utilizes the investments that they now challenge: not only has the Plan Document specifically required the use of MassMutual products and services for many years,[55] but the use of these products and services has always been disclosed to Plan participants in the SPD, a document required to be provided to participants by ERISA.[56] Further, the challenged investments and the use of the MMRS GAC also have been disclosed for many years in MassMutual's public filings, including the Plan's Form 5500, filed annually with the DOL.[57]

Accordingly, Plaintiffs' claims regarding the long-disclosed Plan design, investment and fees are barred by ERISA's three-year limitations period.

B.   **Even After *Tibble*, ERISA's Six-Year Statute of Limitations Largely Bars Plaintiffs' Claims.**

1.   ***Tibble* Does Not Impact Counts III, IV, and V, Which Are Time-Barred.**

Counts III, IV, and V should also be dismissed under ERISA's separate six-year repose period, § 413(1)(A), because *Tibble* does not address the statutory provisions at issue in those

---

[55] *See supra* n.13.

[56] *See* MassMutual Thrift Plan Summary Plan Description (June 2008) ("2008 SPD") at MM-DG-00375, MM-DG-00377-79, Appendix A, Douglass Decl. Ex. 10 (identifying MMRS as administrator and identifying the affiliated investment options and their portfolio managers); ERISA § 102(a), 29 U.S.C. § 1022(a).

[57] *See*, *e.g.*, 2006 Form 5500 at MM-DG-00384, Schedule C, Douglass Decl. Ex. 9 (identifying MassMutual as recordkeeper); *id.* at MM-DG-00387-91, Schedule D (identifying MassMutual as sponsor of investment options). Similarly, the fees related to the challenged mutual funds held in the SIAs have also been publicly disclosed in SEC filings for well over three years. *E.g.*, MassMutual Select Funds Prospectus (Apr. 1, 2010) ("2010 Select Prospectus") at MM-DG-00397, Douglass Decl. Ex. 11 (prospectus excerpt for MassMutual Select S&P 500 Index Fund, f/k/a MassMutual Select Indexed Equity Fund, showing fund expenses).

three counts, and each count challenges actions taken more than six years ago. *Tibble* only addressed a claim brought under ERISA's prudence requirement, § 404(a)(1)(B). 135 S. Ct. at 1828. The Court specifically held that, given trust law's application to ERISA's prudence standard, the Ninth Circuit should reconsider whether plaintiffs there proved that the "fiduciary breached the duty of prudence by failing to properly monitor investments." *Id.* at 1829.

*Tibble* does not apply to prohibited transaction claims, such as Counts III and IV, that are brought under ERISA §§ 406(a) and (b) and are not based upon ERISA's prudence standard. Unlike ERISA's prudence requirement, the prohibited transaction rules are not derived from trust law. *See*, *e.g.*, *Cunningham,* 716 F.2d at 1464 (prohibited transaction rules are designed to supplement trust law obligations). A decision to continue holding certain investments cannot constitute a "transaction" for purposes of the prohibited transaction rules. *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1101 (9th Cir. 2004) ("The decision by [defendants] to *continue* to hold 15% of Plan assets in employer stock was not a 'transaction.'") (emphasis in original).

Accordingly, courts routinely dismiss prohibited transaction claims where, as here, proprietary products and services were chosen more than six years before suit was brought. *See David v. Alphin*, 704 F.3d 327, 341 (4th Cir. 2013) ("[t]he only action that can support an alleged prohibited transaction is the initial selection of the affiliated funds"); *Stargel v. SunTrust Banks, Inc.*, 968 F. Supp. 2d 1215, 1234 (N.D. Ga. 2013), *vacated on other grounds in light of Tibble*, No. 14-13207, slip op. (11th Cir. June 30, 2015) (the challenged transaction was "the original investment in the named funds and the initial offerings of those funds to plan participants").[58]

---

[58] *See supra* n.13. Plaintiffs' allegations that attempt an end run around ERISA's statute of repose also fail because they are not adequately pleaded. For example, Plaintiffs assert that the Plan's contracts have been "amend[ed]" or "reissued" within the repose period. Compl. ¶¶ 135, 139. However, they do not, nor could they, point to any material change during that time that could plausibly be considered to give rise to a "new" breach. Faced with

25

Similarly, Count V, brought under ERISA § 404(a)(1)(D) for allowing investment options to pay for Plan services, is not affected by *Tibble*.  Because the challenged Plan design was implemented more than six years before suit was brought,[59] and Count V is separate from Plaintiffs' prudence claims, Count V also should be dismissed.

### 2.    Even After *Tibble*, Plaintiffs' Breach of Fiduciary Claims in Counts I and II Are Largely Time-Barred.

Unlike Counts III-V, Counts I and II each assert claims under ERISA § 404(a)(1)(B), the prudence provision at issue in *Tibble*.  However, most of these counts still fail under ERISA's six-year statute of repose.

*First*, Count II, by the Complaint's own admission, focuses on the ***selection*** of the challenged investments, not the monitoring of those funds:  the title of Count II itself addresses only selection.  Compl. at 45 (entitled "COUNT II: Selection of Unreasonably-Priced and Imprudent Investment Options For The Benefit of Defendants and at The Expense of the Plan").  Since most funds were selected more than six years before suit was brought—indeed the only three investments as to which the Complaint makes any specific challenge, the Capital Appreciation Fund, the Large Cap Value Fund, and the GIA, were included in the Plan's line-up more than six years before suit[60]—the claims as to most funds are barred.

*Second*, Count I, which focuses entirely on recordkeeping fees, should be dismissed. Plaintiffs do not plead, nor could they, that any separate recordkeeping or administrative fee was actually assessed—instead, all fees were paid by the funds themselves.  As such, dismissal of

---

similar allegations of purported new breaches within the limitations period, the First Circuit has followed the same approach as *David* and *Stargel* and barred these claims.  *See, e.g., Edes*, 417 F.3d at 139 (ERISA claim accrued as of the initial decision, *i.e.*, when employees were hired and classified as to be paid through third-party payroll, not each time they received a third-party payroll check as a result of the allegedly wrongful classification).

[59] *See* MassMutual Thrift Plan, May 1, 2004 Restatement ("2004 Plan Document") at MM-DG-00325-26, § 10.11(a)-(b), Douglass Decl. Ex. 5 (addressing "expenses of establishing and administering the plan").

[60] Compl. ¶ 96; 2006 Form 5500 at MM-DG-00387-88, Douglass Decl. Ex. 9.

claims as to the funds' fees in Count II necessarily requires dismissal of claims in Count I as to those same funds.

*Third*, each of Counts I and II include not only claims for alleged imprudence under § 404(a)(1)(B), but also claims for alleged disloyalty under § 404(a)(1)(A); since *Tibble* addressed only prudence, and not disloyalty, it says nothing about whether Plaintiffs here can effectively render the statute of limitations meaningless as to loyalty claims by asking the Court to effectively apply a continuing violation theory to such claims—which it should not.

### C.     Plaintiffs Fail to Adequately Plead Fraud or Concealment to Revive Stale Claims.

Plaintiffs implicitly acknowledge that they assert stale claims by arguing that any limitations period should be tolled because, allegedly, "Defendants have actively misled and/or have affirmatively concealed material information" concerning the Plan's fees and investments. Compl. ¶ 101.  This theory also fails because such allegations are not adequately pleaded.

ERISA § 413(2) bars untimely claims "except . . . in the case of fraud or concealment." 29 U.S.C. § 1113(2).  To avail themselves of this exception in the First Circuit, Plaintiffs must meet Fed. R. Civ. P. 9(b) pleading requirements and "plead with particularity the facts giving rise to the fraudulent concealment claim."  *J. Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1255 (1st Cir. 1996).  Rule 9(b) requires a plaintiff to specify "the time, place, and content of an alleged false or fraudulent representation."  *Epstein v. C.R. Bard, Inc.,* 460 F.3d 183, 189-90 (1st Cir. 2006) (affirming dismissal of complaint).[61]

---

[61] *See also Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 551-52 (6th Cir. 2012) (dismissing as untimely ERISA claims where plaintiffs failed to identify the time, place, or maker of statements that purportedly concealed the existence of plaintiffs' claims); *Watson v. Consol. Edison of N.Y.*, 594 F. Supp. 2d 399, 411 (S.D.N.Y. 2009) (same); *Larson v. Northrop Corp.*, 21 F.3d 1164, 1173-74 (D.C. Cir. 1994) (in an ERISA fiduciary claim that did not involve fraud, "allegations of fraudulent concealment . . . must meet the requirements of Fed.R.Civ.P. 9(b)") (citing cases); *Hunter v. Custom Bus. Graphics*, 635 F. Supp. 2d 420, 429 (E.D. Va. 2009) (same).

The Complaint fails this test because it does not plead *any* specific factual basis supporting an inference of fraud or concealment.  The "Fraud and Concealment" section of the Complaint merely identifies generic categories of allegedly hidden information and makes a bare assertion that "Defendants have actively misled and/or have affirmatively concealed" such information.  Compl. ¶ 101.  The Complaint does not specify when or where any misrepresentation or omission was made; fails to specify the content of any false or fraudulent representations; and relies entirely on unspecified conduct by "Defendants" collectively, without identifying any person or entity that allegedly concealed any information.  Accordingly, Plaintiffs conclusory assertions of fraud or concealment cannot salvage their time-barred claims.[62]

### III.   Plaintiffs Fail to State Claims Against a Number of the Specific Defendants.

A number of the Defendants also should be dismissed for the additional reason that the Complaint either fails to adequately allege that the defendant had ERISA fiduciary responsibility for the challenged conduct, or fails to sufficiently plead allegations supporting a claim of breach of any duty as to that defendant.

Claims for breach of fiduciary duty and prohibited transactions may only be asserted against a party that is acting as a fiduciary with respect to the challenged conduct.  *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 252-53 (1993) (affirming dismissal of claims under ERISA § 502(a)(3)).  "In every case charging breach of ERISA fiduciary duty . . . the threshold question is . . . whether [the defendant] was acting as a fiduciary . . . when taking the action subject to complaint."  *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).  "[F]iduciary status is not an all or

---

[62] Indeed, Plaintiffs' fraud or concealment allegations fail even to meet notice pleading standards under Fed. R. Civ. P. 8.  *See Iqbal*, 556 U.S. at 678 ("naked assertions devoid of further factual enhancement" are insufficient) (internal quotations omitted).  Moreover, the fact that total investment fees are fully disclosed is inconsistent with any attempt to conceal any alleged breach.

nothing proposition." *Beddall*, 137 F.3d at 18.  "[A] person is a plan fiduciary only 'to the extent' that he possesses or exercises the requisite discretion and control." *Id.* (quoting 29 U.S.C. § 1002(21)(A)).  Courts routinely dismiss ERISA claims at the pleading stage where relevant fiduciary status is not properly pleaded.  *See*, *e.g.*, *Pegram*, 530 U.S. at 231-34 (affirming dismissal); *Beddall*, 137 F.3d at 20 (affirming dismissal).

### A. Plaintiffs Fail to State Any Claim as to Roger Crandall, Stuart H. Reese and/or Robert O'Connell.

Plaintiffs' claims fail against the MassMutual CEOs.

### 1. Plaintiffs State No Fiduciary Breach by the CEOs.

The CEOs cannot be liable for selecting or monitoring investments or services for the Plans because Plaintiffs do not allege that the CEOs had any discretionary fiduciary authority with respect to such selection or monitoring.  Courts have repeatedly held that "ERISA does not attach liability for investment decisions to fiduciaries whose roles were limited to appointing, retaining and removing other fiduciaries." *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 473 (S.D.N.Y. 2005).[63]  Accordingly, the CEOs cannot be held liable for purported losses as a result of the only fees alleged to have been paid—those relating to the investment options offered under the Plan.

Plaintiffs' only allegation with respect to the CEOs is that they (i) appoint fiduciaries to the Plan and (ii) allegedly set the terms of the GAC as counterparty to the Plan.  *See*, *e.g.*, Compl. ¶¶ 9-10.  As to the first claim, Plaintiffs fail to state anything more than conclusory allegations that the CEOs failed to monitor the Plan fiduciaries they appointed.  This failure of pleading requires dismissal of Count VI.  Where a claim for breach of the duty to appoint plan

---

[63] *See also In re McKesson HBOC, Inc. ERISA Litig.*, No. C00-20030RMW, 2002 WL 31431588, at *15-16 (N.D. Cal. Sept. 30, 2002) (board of directors whose responsibilities were limited to appointment and monitoring of plan fiduciaries are not liable for investment decisions); *Hull v. Policy Mgmt. Sys. Corp.*, No. CIV. A.3:00-778-17, 2001 WL 1836286, at *6 (D.S.C. Feb. 9, 2001) (company executives with "only limited fiduciary duties" whose responsibilities did not extent to "investment decisions" for the plan were not liable for plan investments).

fiduciaries prudently contains no allegation that "any specific appointees were incompetent or otherwise subject to replacement for cause," or that the appointing defendants received "any notice of possible misadventure" by appointees, the claim should be dismissed.  *In re Dynegy, Inc. ERISA Litig.*, 309 F. Supp. 2d 861, 903-04 (S.D. Tex. 2004) (dismissing a claim of failure to monitor appointees).  Plaintiffs here do not plead that committee members were incompetent; to the contrary, they make no specific allegations about any committee member at all.  Nor do they plead any notice of misadventure; to the contrary, the pleaded allegations of use of the MassMutual GAC, GIA, and other MassMutual investment products conforms precisely with the Plan Document's mandate.

As to Plaintiffs' second argument, that the CEOs "set the terms" of the GAC (Compl. ¶ 10), the Complaint does not allege, nor could it, that the CEOs took any action as to the GAC—including allegedly setting its terms—as fiduciaries on behalf of the Plan, as opposed to doing so in their corporate capacities as head of the insurance company that issued the GAC that was selected by Plan fiduciaries.

As such, Plaintiffs' conclusory allegations as to the CEOs fail to state a claim.

### 2.     Mr. O'Connell Is Not Subject to Any Claims Because He Left MassMutual More than Six Years Before the Complaint Was Filed.

Defendant Robert O'Connell, a former CEO, should be dismissed for yet another reason—he left the company in June 2005, more than ***eight years*** before suit was brought. Compl. ¶¶ 40-41 (pleading that Mr. O'Connell was CEO prior to June 2005).  Under ERISA § 409(b), a person cannot be held liable for conduct occurring after he left his fiduciary role.  *See* 29 U.S.C. § 1109(b) ("No fiduciary shall be liable with respect to a breach of fiduciary duty . . . if such breach was committed . . . after he ceased to be a fiduciary.").  Because Mr. O'Connell had no responsibility whatsoever with respect to the Company, let alone the Plan, for more than

six years before suit was brought, he cannot be liable for any of the harm alleged in the

Complaint even if he had been a relevant fiduciary (which he had not).  *See Watson v. Deaconess*

*Waltham Hosp.*, 298 F.3d 102, 118 (1st Cir. 2002) (affirming dismissal of a claim against a

defendant who ceased to be a plan fiduciary more than six years ago).

### B.      Plaintiffs Fail to State Any Claim as to Elaine Sarsynski.

Plaintiffs similarly cannot maintain their ERISA claims against Ms. Sarsynski.

Plaintiffs do not allege that Ms. Sarsynski was a named fiduciary of the Plan or that she

had any discretionary authority with respect to the decision to utilize the challenged MassMutual

products and services for the Plan.  Rather, the Complaint relies exclusively on the sole

allegation that Ms. Sarsynski is "the head of the MassMutual department responsible for the

Plan's recordkeeping and administrative services [MMRS]."  Compl. ¶ 47.

However, Plaintiffs themselves state that MMRS is merely the Plan's "recordkeeper" and

"administrative service provider."  Compl. ¶ 153(C).  A plan's recordkeeper and administrative

service provider is generally not a fiduciary at all, and particularly not with respect to the

selection of plan investments or for plan services selected by other fiduciaries.  *See*, *e.g.*, *Hecker*,

556 F.3d at 583 (affirming dismissal of excessive fee claims against service provider who did not

control the plan fiduciary's "negotiation and approval" of its engagement).[64]  In the absence of

any allegation that Ms. Sarsynski possessed or exercised authority or control with respect to the

selection of investment products and services for the Plan or with respect to any fees paid by the

---

[64] *See also Renfro*, 671 F.3d at 323 (affirming dismissal of claims against a service provider whose "limited role" as "delineated" in the service contract "does not encompass the activities alleged as a breach of fiduciary duty—the selection and maintenance of the mix and range of investment options included in the plan"); *Santomenno v. John Hancock Life Ins. Co.*,768 F.3d 284, 293 (3d Cir. 2014) ("a service provider owes no fiduciary duty to a plan with respect to the terms of its service agreement"); *Schulist v. Blue Cross of Iowa*, 717 F.2d 1127, 1130-32 (7th Cir. 1983) (insurer could not be held liable as an ERISA fiduciary for causing a plan to pay it allegedly "unreasonable compensation" where compensation was paid according to contracted rates).

Plan, Plaintiffs' fiduciary claims as to her fail as a matter of law, and she should be dismissed from the case.

### C.        Plaintiffs Fail to State Any Claim as to MassMutual.

Plaintiffs also fail to state a claim against MassMutual.

Plaintiffs plead no basis for MassMutual's fiduciary status apart from its role as plan sponsor.  The Supreme Court has repeatedly held that an employer sponsoring a plan and setting the terms of a plan document is not a fiduciary subject to suit for breach of ERISA fiduciary duty or the commission of a prohibited transaction solely on account of its plan sponsor status.  *See*, *e.g.*, *Lockheed Corp. v. Spink*, 517 U.S. 882, 889-91 (1996); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443-46 (1999) (company cannot be subject to fiduciary liability simply by virtue of its role as plan sponsor).  The doctrine of *respondeat superior* does not apply with respect to ERISA fiduciary duty claims.  *See DiFelice v. U.S. Airways, Inc.*, 397 F. Supp. 2d 758, 780 (E.D. Va. 2005).

Here, the Complaint affirmatively pleads that specific individuals—and not the company—have the relevant responsibilities to implement the Plan Document and make decisions for the Plan, including the duty to appoint and monitor other Plan fiduciaries.  Compl. ¶ 42 (CEO appoints Plan fiduciaries).  Because MassMutual is not alleged to have made investment decisions for the Plan in a fiduciary capacity or to have appointed those who were responsible for such decisions, it cannot be liable under ERISA for those investments.  *See Hull*, 2001 WL 1836286, at *6 (dismissing claims against plan sponsor who did not have the "authority to make investment decisions" because Plaintiffs failed to plead "any fiduciary duty owed by [the company] to the Plan which would be implicated by the alleged wrongs").

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.


Dated:  July 2, 2015                              Respectfully Submitted,

                                                  DEFENDANTS.

                                                  By their attorneys,

                                                  /s/ James Fleckner
                                                  James O. Fleckner (BBO# 641494)
                                                  Alison V. Douglass (BBO# 646861)
                                                  Goodwin Procter LLP
                                                  Exchange Place
                                                  53 State Street
                                                  Boston, MA 02109
                                                  T: 617-570-1000
                                                  F: 617-523-1231
                                                  JFleckner@goodwinprocter.com
                                                  ADouglass@goodwinprocter.com


## CERTIFICATE OF SERVICE

I, James O. Fleckner, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 2, 2015.

                                                  /s/ James Fleckner
                                                  James O. Fleckner


82915080

33